# In the United States Court of Federal Claims

No. 24-1945
Filed: March 31, 2025
Re-issued: April 8, 2025[1]

_____

|   |   |
|---|---|
| LOYAL SOURCE GOVERNMENT SERVICES, LLC, | ) ) ) |
|   | ) |
| *Plaintiff*, | ) |
|   | ) |
| v. | ) ) |
|   | ) |
| THE UNITED STATES, | ) ) |
|   | ) |
| *Defendant*. | ) |

_____

*Samuel Knowles*, DLA Piper LLP (US), Washington, D.C., for Plaintiff Loyal Source Government Services, LLC. *Thomas E. Daley* and *David R. Lacker*, *of counsel*.

*Galina I. Fomenkova*, Senior Trial Counsel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Brett A. Shumate*, Acting Assistant Attorney General, *Patricia McCarthy*, Director, *Douglas K. Mickle*, Assistant Director, *Roger A. Hipp* and *Pavan Mehrotra*, Department of Homeland Security, *of counsel*.

## OPINION AND ORDER

**MEYERS, Judge**.

  Loyal Source Government Services, LLC ("Loyal Source") has provided medical services to people crossing the Southern Border under a contract with the Department of Homeland Security ("DHS") for years under a now-expired contract. The procurement for a replacement contract (the "Solicitation") has not gone smoothly; protests have tied up the procurement for several years, resulting in a series of bridge contracts. In fact, this is Loyal Source's second pre-award protest of this procurement in this court alone.

  This one brings two distinct challenges. First, it alleges that there are patent ambiguities in the Solicitation that require clarification through amendment of the Solicitation. Because the Solicitation is not ambiguous, this argument fails. Second, Loyal Source complains that it was

---

[1] The court initially filed this Opinion and Order under seal to allow the parties to propose redactions. The parties submitted their proposed redactions, ECF No. 33, and the court has incorporated those proposed redactions and makes them with bracketed asterisks ("[ * * * ]") below.

compelled to provide certain pricing data regarding the wages it pays its employees that standard commercial practices do not require, making the disclosure requirement impermissible. Loyal Source has a point. The governing regulations require disclosure of the requested information if a contractor seeks a wage adjustment during contract performance. For proposal purposes, the offeror need only warrant that it has not included certain costs in its proposal. Putting aside the commercial practices (or lack thereof), the contracting officer has attempted to rewrite or tailor the governing regulation without getting the required approval. But the lack of non-speculative prejudice dooms this protest. And even if it did not, the court would decline to enjoin this procurement because the harm of requiring the Government to restart this procurement with new proposals at this late stage far outweighs the harm to Loyal Source from the requirement to disclose certain information earlier than the regulations permit. Therefore, the court denies Loyal Source's motion for judgment on the administrative record and grants the United States' cross-motion for judgment on the administrative record.

## I.    Background

### A.    Medical Services at the Border

The Department of Homeland Security and the Customs and Border Protection Agency ("CBP") safeguard the nation's borders and "facilitate[] lawful international travel and trade." Tab 56.a at AR6125. CBP is on the front line of securing the Southern Border. *Id.* It addresses a wide range of problems, like border security, immigration, and public health. *Id.* It also detains and apprehends over one million individuals annually,[2] most of whom cross at the Southwest Border. *Id.*

Migrants often endure grueling treks through harsh conditions "that adversely affect their health and well-being and pose medical and public health concerns upon apprehension and processing." *Id.* CBP's mission includes ensuring that individuals in custody receive necessary medical treatment tailored to the high-pressure, "front-line operational environment." *Id.*

To provide these services, CBP issued this procurement.

### B.    The Procurement

The procurement seeks to meet CBP's medical support requirements and enhance CBP's capacity to respond effectively to the demands for medical care along the Southern Border. *See generally id.* at AR6125–30. The successful bidder must provide qualified medical professionals, who will provide medical services. Tab 119.d at AR9989. Tasks include conducting health intake interviews and medical assessments, as well as managing and monitoring medication. Tab 2 at AR322. Importantly, the successful bidder must have operational flexibility, a necessity that became evident "during the 2014 influx of [u]naccompanied [c]hildren." *Id.*

---

[2] The record in this case does not run to present day, so the court does not consider current levels of border crossings.

Loyal Source won the predecessor contract in 2015. *See* Tab 6 at AR350. CBP had limited needs during the first years of the contract, but as migration flows surged, so did CBP's demand. *See id.* at AR349. Initially, CBP only needed support eight hours per day at three locations. Following the surge in crossings, however, it needed support around the clock—i.e., twenty-four hours per day and seven days per week—at more than seventy locations. *Id.* And now CBP estimates that it will need support at more than ninety locations through 2027. *Id.*

CBP's experience with the prior contract made clear how important flexibility in the contract was "to expand services in new and existing locations" as operational needs changed. *Id.* at AR351. Accordingly, the work under the new contract would be "dynamic in nature, requiring a solution . . . flexible enough to meet the mission, adjust to changes in policy, allow CBP to add/delete sites, and adjust to changes in operational circumstances." *Id.* The new procurement also seeks to allow the Agency "to practice adequate oversight of the contractor via specific deliverables and tracking." *Id.*

To meet these needs going forward, CBP issued Solicitation No. 70B03C22Q00000081 on July 8, 2022. *See* Tab 22. The award would be issued on a best value basis, and the procurement was split into two phases. Tab 56.a at AR6080, AR6178. In Phase I, CBP would evaluate bidders' staffing plans and corporate experience. *Id.* at AR6178. In Phase II, CBP would evaluate bidders' technical approaches and capabilities, past performance, and price. *Id.* Price is evaluated for reasonableness, and all factors other than price, when combined, are significantly more important than price. *Id.* at AR6198, AR6200.

Vighter, LLC won the initial contract award. Tab 106 at AR9384. Loyal Source and other bidders filed multiple protests, which have resulted in corrective action including amendments to the Solicitation. *See, e.g.*, Tabs 46–51.

At present, the Phase I evaluations are complete and Phase II is ongoing, meaning that DHS (which is now handling the evaluation and award process) has not made any new award decision. Loyal Source remains the incumbent contractor. Since September 2022, it has performed under a series of sole-source bridge contracts. Offerors submitted their proposals in October 2024. *See* Tab 56.a at AR6080.

Having provided a general background to the Solicitation, the court now explains specific terms.

        1.    <u>The Terms of the Solicitation</u>

The Solicitation requires contractors establish, operate, and staff medical units ("MUs"). *Id.* at AR6129–30. The required staffing for the MUs consists of personnel in several labor categories. It includes physicians (Regional Physician Supervisors ("RPSs") and Regional Pediatric Advisors ("RPAs"), among other physicians staffing the MUs, if the contractor so chooses), advanced practice providers (nurse practitioners and physician assistants), and support staff (like EMTs). *Id.* at AR6095, AR6124, AR6129. The team must be "trained, licensed, privileged, and credentialed." *Id.* at AR6129.

Advanced practice providers and support staff perform most of the necessary medical services, although CBP and the contractor will, working in conjunction, determine the exact numbers and qualifications based on local requirements. *Id.* at AR6129–30. The Agency provided expected staffing levels per shift for advanced practice providers and support staff. *See* Tab 45.a. It did not provide staffing estimates for physicians. *See id.*

          *a)*        *RPSs and RPAs*

RPSs and RPAs are required to have a "current, active, valid, and unencumbered license, registration, or certification as a Doctor of Medicine (M.D.) or a Doctor of Osteopathy (D.O.) issued by any United States jurisdiction." Tab 52.c at AR5646, AR5652.

RPSs provide "medical direction and necessary guidance/oversight as required by state licensure for appropriate advanced practice provider supervision, oversight, consultation, coordination, and direction for all medical services." *Id.* at AR5648–50, AR5654–55. They also "[s]erve as the sector/region medical authority for the medical services contract" and MUs, and "exercise [c]linical supervisory authority over sector physicians, mid-level providers, all clinical staff, all medical unit functions, laboratory, and pharmacy." *Id.* at AR5648–50. Finally, RPSs are supposed to "[p]rovide[] on-call coverage for assigned medical units/sector 24 hours a day/7 days a week," have the "[a]bility to travel to each assigned medical unit quarterly[,] and be able to work at an assigned medical unit daily to provide oversight as required." *Id.* at AR5648.

RPAs, like RPSs, "[s]erve[] as the on-site regional pediatric medical authority." *Id.* at AR5654. They focus on pediatric care, and must "[p]rovide[] on-call pediatric coverage for assigned medical units/sector 24 hours a day/7 days a week," and have the "[a]bility to travel to each assigned medical unit quarterly and be able to work at an assigned medical unit daily to provide oversight as required." *Id.*

A previous version of the Solicitation provided offerors anticipated RPS and RPA staffing levels. *See* Tab 45.g. Loyal Source protested the staffing levels, however, because they violated certain state laws regarding how many people the RPAs and RPSs could supervise at one time. As a result, the Agency removed the proposed staffing levels, converted these two positions to be firm-fixed price (rather than an hourly rate for each), and reiterated that the contractor would be responsible for ensuring compliance with all applicable state and federal laws. In other words, and the offerors had to propose a firm-fixed price that "shall support a level of effort in accordance with the statement of work and applicable state law regarding the oversight" of advanced practice providers. Tab 56.a at AR6199. The proposed staffing should "allow[] for the successful performance of all [RPS and RPA] requirements . . . to include, for example, on-call, in-person, and/or telemedicine capabilities." Tab 56.b at Instructions.

Finally, offerors could "describe their contracting team's approach and capabilities related to the supervision and provision of high-quality, professional, trauma-informed medical support services," like those "related to overall administration and management." Tab 56.a at AR6196–97. These narratives will help inform DHS's best value determination. DHS "will not evaluate prospective compliance with state law as part of the award decision except, possibly, as part of the responsibility determination." Tab 53.b at AR5825.

> b)    *License Portability*

License portability means that "for purposes of Federal medical work," "the license [can] be issued by any United States jurisdiction." ECF No. 26 at 7. In other words, a doctor could be licensed in California and provide services in Massachusetts without licensure there. Thus, license portability preempted state medical regulation. Prior versions of the Solicitation included license portability, which Congress expressly authorized in the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. Pub. L. No. 116-136, Div. B., Title VI, § 16005, 134 Stat. 282, 545 (2020); Tab 69 at AR6531. But that authorization lapsed in the time that this procurement has been bogged down in protests, meaning that there is no longer any Congressional authorization for DHS to preempt state medical regulation and allow license portability.

After the CARES Act lapsed, the Agency's Office of Health Security ("OHS") issued a memorandum distinguishing between "DHS health care providers" and "DHS-credentialed health care providers." *See* Tab 68. For DHS health care providers—who are DHS employees—license portability remains available, at least insofar as OHS is concerned. *Id.* at AR6515–16. Different rules apply for DHS-credentialed health care providers—who are generally contractors. While DHS may accept a license "from any U.S. jurisdiction, contractor requirements are additionally subject to the applicable Statement of Work and other relevant contract provisions." *Id.* at AR6517. DHS also emphasized that "[c]ontractors retain responsibility for ensuring that their personnel meet both contractual specifications and applicable Federal and/or State laws." *Id.*

As a result, the Solicitation "requires that medical staff be properly licensed, credentialed, and have relevant training and experience to meet contract needs." Tab 56.a at AR6161. RPSs and RPAs may be licensed in "any" United States jurisdiction, Tab 52.c at AR5646, AR5652, but contractors "assume[] sole responsibility for determining whether license portability is permissible." Tab 56.a at AR6138, AR6142. Finally, during the procurement's questions and answers, multiple parties asserted that the Solicitation was preempting state law. The answers, however, rejected this assertion each time it was made. Tab 53.b. at AR5825–26.

> c)    *Disclosure of Wage & Hourly Rates and Price Adjustments*

Previously, Amendment 23 required offerors provide underlying wage and health and welfare ("H&W") rate information for all labor categories. Tab 51.a at AR5438–39. Loyal Source protested this requirement before the Government Accountability Office ("GAO"), arguing that the requirement was inconsistent with customary commercial practice. Tab 102.a at AR8525–27. The Government again took corrective action. Tab 112 at AR9400; Tab 70 at AR6539. It explained that the data was needed only for those labor categories subject to the Service Contract Labor Standards ("SCLS") of the Fair Labor Standards Act of 1938. Tab 70 at AR6538. Therefore, the Solicitation now requires the H&W rate information for those positions subject to the SCLS.

Federal Acquisition Regulation ("FAR") 52.222-43[3] ensures contractors providing labor subject to the SCLS can seek price adjustments to match any changes in the applicable wage determinations or applicable amendments to the Fair Labor Standards Act. *Call Henry, Inc. v. United States*, 855 F.3d 1348, 1350 (Fed. Cir. 2017) ("[T]he [Service Contract Act] requires that a service contract include provisions specifying the contract's wage determination, which sets the wage rates and fringe benefits that must be paid to various classes of covered service employees."). The clause also grants the contracting officer "access to and the right to examine any directly pertinent books, documents, papers and records of the [c]ontractor." FAR 52.222-43(g). Thus, when a contractor seeks an adjustment under the clause, it must produce "any relevant supporting data, including payroll records, that the Contracting Officer may reasonably require." FAR 52.222-43(f). To explain the requirement for the disclosure in the Solicitation, the contracting officer wrote:

> The Government requires [the H&W information] so an assessment using the authority of FAR 52.222-43 can be appropriately made. If the Government were to only review a loaded labor rate's escalation, without wage rate and H&W information, the Government could not determine whether those rates subject to a wage determination are also being escalated.

Tab 70 at AR6538. The contracting officer next concluded that "[i]t is common practice to require wage rate and H&W information for commercial products and/or services." *Id.* He cited two prior DHS solicitations and a Civilian Board of Contract Appeals ("CBCA") decision in support of his decision. *Id.* at AR6538–39.

Loyal Source protested at the GAO several times. But its complaints persist. It seeks relief from this court, which must now resolve cross-motions for judgment on the administrative record.

## II.    Standard of Review

The United States Court of Federal Claims exercises, in accordance with § 706 of the Administrative Procedure Act, a limited and deferential scope of review in bid protest actions. *See Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013); 5 U.S.C. § 706(2)(A). A reviewing court shall set aside the contested agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Review is two-fold. "The court's task is to determine whether (1) the procurement official's decision lacked a rational basis; or (2) the procurement involved a violation of regulation or procedure." *Glenn Def. Marine (Asia), PTE Ltd.*, 720 F.3d at 907 (internal quotation marks omitted) (quoting *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010)). Such review is "highly deferential"; the court is not to determine whether there is a better or "more correct way" to perform the underlying action. *IAP World*

---

[3] All of the FAR provisions appear in Title 48 of the Code of Federal Regulations.

*Servs., Inc. v. United States*, 153 Fed. Cl. 564, 567 (2021). So long as there is a "reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1371 (Fed. Cir. 2009) (internal quotation marks omitted) (quoting *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (explaining how the court must assess "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion") (internal quotation marks omitted) (cleaned up)); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (reiterating the "substantial discretion" that procurement officials have).

On the other hand, a decision is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation of its decision that runs counter to the evidence before the agency, or [provided a decision that] was so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"[T]he disappointed bidder bears [the] heavy burden of showing that the [] decision had no rational basis." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (internal quotation marks omitted) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)).

Regardless, the protester must, in addition to error, show that the error caused prejudice—there is no presumption. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996); *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997–98 (Fed. Cir. 2021). To establish prejudice in a pre-award protest, Loyal Source must show it suffered "a non-trivial competitive injury which can be addressed by judicial relief." *Weeks Marine, Inc.*, 575 F.3d at 1362–63 (internal quotation marks omitted).

## III.    Discussion

Loyal Source complains of several provisions in the Solicitation. First, it argues that ambiguities "prevented offerors from intelligently pricing the RPS and RPA labor categories and preclude evaluation on an equal basis." ECF No. 22 at 12 (cleaned up). Second, it argues that the requirement to disclose wage and H&W rates is impermissible because such disclosures were not customary commercial practices as the FAR requires. *Id.* at 29. Because Loyal Source has protested this Solicitation several times, the court starts there to understand how the procurement got to this point, and then turns to Loyal Source's arguments.

### A.    Loyal Source's Prior Protests

Three of Loyal Source's prior GAO protests are relevant to this dispute. In the first, Loyal Source complained that "the Solicitation requires offerors to comply with state credentialing, licensure, and supervision rules while adhering to specific staffing level requirements." Tab 88.a at AR7362. Because those requirements "cannot be reconciled," Loyal Source argued, offerors faced "uncertainty and ambiguity." *Id.* Loyal Source wanted to be able to "deviate from the prescribed number of positions." *Id.* at AR7365. Finally, Loyal Source

argued that the requirements were "unduly restrictive and [were] not reasonably required to meet [] the Agency's minimum needs." *Id.* at 7369–72 (cleaned up). Loyal Source asserted that "the Agency could allow [RPSs and RPAs] to possess licenses anywhere in the United States, preempting State law[, which] would allow offerors to shift staff around between states, as necessary." *Id.* at AR7372. CBP chose to amend the Solicitation and "revise [its] requirements by removing the [Statement of Work] language requiring that medical personnel be licensed in the state of performance," and the GAO dismissed the protest. *See* Tab 100 at AR8503.

In the second, Loyal Source complained of Procurement Integrity Act violations that eventually compelled a transfer of the procurement from CBP to DHS Headquarters for the remainder of the procurement. *See* Tab 102.a at AR8518. That protest also challenged the "predetermined staffing levels and supervisory controls" as "ambiguous and unduly restrictive," and in conflict with state law. *Id.* at AR8508. It also contended that the disclosure of wage and H&W rates would be "inconsistent with customary commercial practice[]." *See id.* at AR8523. Finally, the protest took issue with the alleged vagueness of the availability of license portability. *Id.* at AR8515. GAO dismissed the protest after DHS filed a notice of corrective action. *See* Tab 123.

And in the third, Loyal Source protested again on similar grounds as at issue here, but the GAO dismissed that protest because of Loyal Source's other pending protest[4] before this court. *See* Tab 137 (dismissing the protest "because the matter involved is currently pending before a court of competent jurisdiction").

### B. The Terms of the Solicitation

Loyal Source argues that five ambiguities in the recent amendments plague the Solicitation. The court will address each in turn.

#### 1. The Agency reasonably removed staffing level estimates and appropriately placed responsibility for state law compliance on contractors.

Three of the arguments intertwine. Loyal Source argues that it could not intelligently price its proposal because the Government (1) removed staffing level estimates for certain labor categories, (2) has not clarified which state law applies, and (3) has improperly required offerors to determine the availability of license portability, even though the Government has already answered that question. Because its second and third arguments hinge in part on the first, the court starts with the removal of staffing level estimates.

Previous versions of the Solicitation included staffing level estimates for the RPS and RPA labor categories and the number of advanced practice providers and support staff they were required to supervise. *See* Tab 45.a, g. Loyal Source protested. Tabs 88.a, 102.a. As part of corrective action, the Agency removed the RPS and RPA staffing estimates. *See* Tab 52; Tab 56.a at AR6082. Loyal Source now argues that this frustrated pricing because "the Solicitation

---

[4] At the time of the third GAO protest, Loyal Source had already filed another protest in this court, Case No. 24-1001. The undersigned issued the opinion in that protest contemporaneously with this opinion.

no longer contains any direction as to the anticipated level of effort required for these two labor categories in performance of the contract, [which] had a significant impact on the ability of offerors to intelligently propose a firm-fixed price" and to therefore be evaluated on an equal basis. ECF No. 22 at 22 (Loyal Source's emphasis of "any" removed). Loyal Source further argues that the varying state supervisory laws that apply to RPSs and RPAs overseeing advanced practice providers compounds the ambiguity. Because different laws may apply, Loyal Source contends that the Solicitation fails to provide sufficient information to allow the offers to intelligently submit their proposals.

Removing the estimates was an appropriate exercise of discretion that does not leave offerors with an "unacceptable level" of risk. *Fabrics, Plus, Inc.*, B-218546, 1985 WL 52925 (Comp. Gen. July 12, 1985). First, agencies may "impose[] maximum risks on the contractor and minimum burdens on the agency." *FirstLine Transp. Sec., Inc. v. United States*, 107 Fed. Cl. 189, 210 (2012) (internal quotation marks omitted) (quoting *Katmai Info. Techs., LLC*, B-406885, 2012 CPD ¶ 277 (Comp. Gen. Sept. 20, 2012)). The offeror must "account for [such risk] in formulating its proposal." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Katmai Info. Techs., LLC*, B-406885, 2012 CPD ¶ 277 (Comp. Gen. Sept. 20, 2012)). There is no dispute that the Solicitation now imposes the entirety of the risk of complying with state law on the offerors. ECF No. 28 at 5–6. That may not be how Loyal Source wants the risk allocated, but Loyal Source does not get to dictate the amount of risk the Agency places on it. That said, the Solicitation allows for the reduction of this risk imposed on offerors by permitting post-award adjustments to comply with state law and actual staffing requirements of subordinate personnel. ECF No. 26 at 21 (quoting Tab 56.a at AR6082).

Second, even though there is "no obligation to provide potential offerors with its internal staffing estimates," *FirstLine Transportation Security, Inc.*, 107 Fed. Cl. at 210, the Agency has in fact provided some guidance to offerors. It provided estimates for advanced practice providers and support staff that offerors can use to price and estimate the RPS and RPA categories. As Loyal Source contends, the states in which performance is to occur have laws regulating the number of people a physician may supervise. ECF No. 22 at 16–17. In California, a physician can supervise no more than four advanced practice providers. Cal. Bus. & Prof. Code § 3516(b)(1). In Arizona, six. Ariz. Rev. Stat. § 32-2533(C). In Texas, seven. Tex. Occ. Code § 157.0512(c). In Florida, ten. Fla. Stat. § 458.347(3). And New Mexico imposes no limit so long as "the physician can effectively supervise and communicate within the circumstances of their particular practice setting." N.M. Code. R. § 16.10.15.10(A). Thus, the Solicitation provides a roadmap for offerors by indicating a *minimum* number of RPAs and RPSs that would be required—at least enough necessary to comply with state law. Of course, there is no requirement that offerors propose the minimum number of RPAs and RPSs to satisfy the Solicitation requirement.

Nor is there any requirement that each offeror propose the same number of RPSs and RPAs; the Agency is simply looking to ensure "that the quoter understands the requirement and will be successful in performing the task order." Tab 56.a at AR6201. To do that, offerors can structure their proposals in different ways, using their staffing and pricing judgment. And the Agency has also provided a section where offerors can provide a "'narrative of their operational approach to performing the requirements'" of the Solicitation and "describe their 'approach and

9

capabilities related to the supervision and provision of high-quality, professional, trauma-informed medical support services.'"  ECF No. 30 at 1, 3 (quoting Tab 56.a at AR6196).  All that information will be evaluated by the Government in its best value analysis.

The court is not persuaded otherwise by the series of non-binding GAO decisions that Loyal Source cites for the general proposition that, in certain cases, estimates are necessary.  ECF No. 22 at 14 (first citing *West Coast Copy, Inc.*, B-254044, B-254044.2, 1993 WL 476970 (Comp. Gen. Nov. 16, 1993); and then citing *Fabrics Plus*, 1985 WL 52925).  In *West Coast Copy*, the GAO considered a protest to "the award of a licensing agreement . . . for providing photocopying services to the public" at a federal bankruptcy court.  1993 WL 476970, at *1.  Loyal Source points to the GAO's statement that "without estimates, vendors lack the information necessary for pricing their services intelligently."  ECF No. 22 at 14 (internal quotation marks omitted) (quoting *West Coast Copy*, 1993 WL 476970, at *5).  But that procurement (1) involved evaluation of price and qualifications on an equal basis, and (2) was post-award, so the disappointed bidder could show prejudice.  Here, however, (1) price is the least important of the factors to be considered, and (2) Loyal Source cannot show prejudice for the same reasons described below.

And in *Fabrics Plus*, the GAO remarked that the "[f]ailure to include any estimates at all of future requirements, or a reasonable alternative, constitutes a solicitation deficiency if the uncertainty and risk involved reach an unacceptable level."  ECF No. 22 at 14 (quoting *Fabrics Plus*, 1985 WL 52925, at *3).  Here, however, (1) the Solicitation provides a "reasonable alternative"—offerors have guidance on pricing via advanced practice provider estimates, and (2) the Solicitation allows offerors to request price adjustments when necessary, a factor absent from *Fabrics Plus*.

In sum, removing the staffing estimates was reasonable.  Having resolved the first argument, the court turns to the next two arguments: the applicable state law and license portability.

The Solicitation maintains that RPSs and RPAs must have valid licenses "issued by any United States jurisdiction."  Tab 52.c at AR5646, AR5652.  Medical services under the Solicitation will be provided in Arizona, California, Florida, New Mexico, and Texas.  *See* Tab 56.b at Total-Schedule of Services.  Each state has different regulatory requirements.  Yet offerors are instructed to price these labor categories in a way that "support[s] a level of effort in accordance with the statement of work and applicable state law regarding the oversight of" advanced practice providers.  *Id.* at Instructions; *see* Tab 56.a at AR6142.

Loyal Source contends that "applicable state law" is patently ambiguous and requires clarification.  That ambiguity, it says, is compounded, because it means it must determine whether license portability is permissible under the contract, even though the Agency has previously said otherwise.  According to Loyal Source, the Solicitation "leaves critical [pricing] questions unanswered," ECF No. 28 at 3, because it does not specify which state's law is applicable.  ECF No. 22 at 15.  Specifically, Loyal Source complains about the differing number of people the RPAs and RPSs may supervise: California allows a physician to supervise a maximum of four advanced practice providers; Arizona allows six; Texas allows seven; Florida allows ten; and New Mexico does not impose any limit so long as the physician maintains his or

her effectiveness. Thus, Loyal Source contends that it cannot determine if it should apply the law of "the state in which a proposed RPS or RPA is licensed," *id.* at 15, or the law "wh[ere] that individual will be providing services under the contract." *Id.* at 16. Loyal Source says this ambiguity made intelligent pricing impossible. *Id.* at 17–18. And because the Solicitation calls for firm-fixed pricing for these positions, Loyal Source argues, proposing it "'in accordance with' one state's supervisory ratio requirements could mean that such prices are not 'in accordance with' another state's supervisory ratios." *Id.* at 17 (emphasis omitted). In other words, Loyal Source contends that the firm-fixed pricing structure, combined with lack of clarity regarding what state supervisory law to apply, precluded intelligent pricing because an "offeror who reasonably interpreted the Solicitation as requiring it to comply with more conservative supervisory ratios runs the risk of being underbid by another offeror who reasonably interpreted the Solicitation to allow for more flexible supervisory framework." *Id.* at 19. Loyal Source seeks additional amendments that (1) clarify RPS and RPA staffing levels—i.e. what state law governs the number of people RPSs and RPAs can supervise and (2) revert the Solicitation to rate-based pricing for RPSs and RPAs. *Id.* at 20.

"As a general rule, offerors must be given sufficient detail in an RFP to allow them to compete intelligently and on a relatively equal basis." *Glenn Def. Marine (ASIA), PTE Ltd.*, 97 Fed. Cl. at 578 (internal quotation marks omitted) (quoting *Interface Flooring Sys., Inc.*, B-225439, 1987 WL 101567, at *5 (Comp. Gen. Mar. 4, 1987)), *appeal dismissed*, 459 F. App'x 906 (Fed. Cir. 2011). But:

> while [s]pecifications must be free from ambiguity and describe the minimum needs of the procuring activity accurately . . . . there is no legal requirement that a competition be based on specifications drafted in such detail as to eliminate completely any risk for the contractor or that the procuring agency remove all uncertainty from the mind of every prospective offeror.

*FirstLine Transp. Sec., Inc.*, 107 Fed. Cl. at 208 (alterations in original) (citations omitted). Here, the Solicitation is not ambiguous.

First, Loyal Source's argument rests on the premise that the Agency is preempting state law. If the Agency were preempting state law, it would have to resolve for offerors the choice-of-law question. In other words, the Agency would have to tell the offerors what state's law is the "applicable" law. But the Agency has repeatedly explained that it was not preempting state law. During the Q&A process, the Agency responded to thirteen questions premised on preemption by stating that "DHS disagrees with the characterization that the [A]gency has expressly preempted state law." Tab 53.b. at AR5825–26. In fact, the Solicitation repeatedly instructs offerors to comply with all applicable federal, state, and local laws. *See* Tab 56.a at AR6138, AR6142; Tab 68 at AR6517; Tab 69 at AR6531–32.

Second, and even more importantly, DHS no longer has the statutory authority to preempt state law in this way. The CARES Act, which expressly authorized license portability for DHS (i.e. the authority to preempt state regulation of doctors working for DHS), expired. *See* ECF No. 26 at 28. This means that DHS lacks the authority to preempt state law because the "Supremacy Clause of Art. VI of the Constitution provides Congress with the power to preempt

state law [and] preemption may result from a federal agency [only when the agency] is acting within the scope of its congressional delegated authority." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368–69 (1986) (cleaned up). Therefore, Loyal Source's argument that the Agency's decision to require offerors to determine whether license portability is permissible and to withhold the OHS Memorandum (which, recall, permitted license portability for DHS employees, but that was when the CARES Act was still in effect) was unreasonable fails. Instead, determining which state law is applicable "is precisely the exercise of judgment and expertise that DHS is paying the *contractor* to bring to the table." ECF No. 30 at 5–6 (emphasis in original). What is more, as the both the Solicitation and the OHS Memorandum instruct that contractors retain the ultimate responsibility to ensure compliance with all applicable laws, the documents are in accord. *See* Tab 56.a at AR6138, AR6142; Tab 68 at AR6517; Tab 69 at AR6531–32.

Third, the Solicitation provides that it will accept licensure in "any U.S. jurisdiction" for the purposes of contract administration. In other words, the contract requirement is that an RPA or RPS hold a license in any United States jurisdiction. ECF No. 26 at 7–9. But that does not mean that the state or states in which an RPA or RPS provides services will accept that license too. Nor does it impact what state law governs the practice of medicine in any of the states where the awardee must provide medical services. It just means that the Solicitation neither authorizes nor forbids interstate practice. And the Solicitation also unambiguously requires the contractor to fully comply with all applicable federal and state laws. *See* Tab 56.a at AR6138, AR6142; Tab 68 at AR6517; Tab 69 at AR6531–32. Thus, the Agency is not stating that a doctor licensed in New Mexico may provide medical services in California. Instead, whether any state will accept out-of-state licensure or defer to another state's supervisory rules is ultimately up to the individual states—a necessary outcome under our federalist system.

Consider a hypothetical where an offeror proposes to deploy a RPS licensed only in California to provide medical care in Texas and supervise six personnel. There is nothing in the contract that would require Texas to allow a California doctor to practice medicine in Texas. Nor could there be. Recall too that California only allows physicians to supervise four people at one time, while Texas allows a physician to supervise up to seven. There is nothing in the Solicitation that permits or prohibits this, but that says nothing about what, if anything, California might do regarding its licensee overseeing more than four people. Those are all questions for the states, which may well answer them differently. And the Agency is certainly within its right to offload the resolution of these choice of law issues to the contractors as it has plainly done here. Knowledge of the varying state laws and requirements is all part of the pricing and expertise that offerors can propose, in addition to their "narrative of their operational approach to performing the requirements" of the Solicitation and "describ[ing] the team's approach and capabilities." Tab 56.a at AR6196. The Agency is looking to ensure "that the quoter understands the requirement and will be successful in performing the task order." *Id.* at AR6201. In the end, all the Agency is requiring is that the contractor provide a lawful solution that provides staffing to medical facilities providing care to migrants.

That the Solicitation allows different staffing strategies is a feature, not a bug. Contractors retain latitude to propose different staffing strategies, like using providers licensed in multiple states, using providers only in states in which they hold licenses, or basing coverage on

the most restrictive state's rules. Nothing in the Solicitation prevents an offeror from securing multiple licenses for its physicians, or from structuring its workforce to meet the various licensing regimes: the "[S]olicitation now gives offerors complete control over how many" RPS and RPAs to propose. ECF No. 26 at 16. And "offerors are not required to offer DHS the identical number of [RPSs or RPAs]." ECF No. 30 at 2. What does matter is that the *contractor*, operating in its area of expertise, figure out how to comply with state law. To be sure, the Solicitation does show a preference for local staff for advanced practice providers. Tab 56.a at AR6171. And as Loyal Source readily recognizes, "[m]edical service providers typically are required to follow the requirements of the state in which the services are provided." ECF No. 22 at 16. But those are issues for the contractor to resolve, not the Agency.

In sum, the fact that the Agency has chosen to assign the risk to the offerors to comply with state law is not an ambiguity, nor is their ability to propose staffing levels based on their own expertise.

2.    The on-site requirements are not ambiguous.

Loyal Source reads the Solicitation to have another patent ambiguity—contradictory terms, in fact—regarding whether the RPAs and RPSs must be present in the MUs on a 24/7 basis. According to Loyal Source, the Solicitation both does not require their presence at the MUs and requires their presence at the same time. *See id.* at 24. It further contends the switch from rate-based to firm-fixed pricing exacerbates this lack of clarity. *Id.* at 24–25. Without rate-based pricing, the offerors must decide "[w]hether RPSs and RPAs are required to be on-site on a daily basis, or, conversely, whether there is more discretion for RPSs and RPAs to fluctuate between being present and being on-call," and that decision by offerors "has a material impact on the firm-fixed prices offerors would propose." *Id.* at 24. For example, Loyal Source says, "[i]f RPSs and RPAs were required to be on-site daily, offerors would need to build a number of costs into their proposed fixed-price amounts for these labor categories, including, but not limited to, costs associated with significant daily travel to remotely located medical units, lodging, and per diem." *Id.* Loyal Source wants the Agency to amend the Solicitation and (1) clarify whether RPSs and RPAs must be on-site at MUs daily, and (2) revert the RPSs and RPAs to rate-based pricing. *Id.* at 25.

Because this argument turns on the text of the Solicitation, the court begins (and ends) there. *Thaler v. Vidal*, 43 F.4th 1207, 1210 (Fed. Cir. 2022) (citing *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004)). The Solicitation's staffing model "does not require physicians to be in the MU, however, they can be utilized in the MU." Tab 56.a at AR6129–30. So far, the Solicitation is clear—an offeror may, but is not required to, assign a physician to staff an MU. Loyal Source sees a problem, however, with the position description for the RPAs and RPSs that states that they must "be able to work at an assigned medical unit daily to provide oversight as required." Tab 52.c at AR5648 (RPS position description), AR5654 (RPA position description). Thus, Loyal Source cannot determine whether the RPAs and RPSs must be in the MU on a daily basis.

But the Solicitation is not ambiguous, which becomes clear when one reads the entire sentence about providing daily oversight in the MUs. In its entirety, the Solicitation provides that the RPAs and RPSs must have the "[a]bility to travel to each assigned medical unit quarterly

and be able to work at an assigned medical unit daily to provide oversight as required." Tab 52.c at AR5648 (RPS position description), AR5654 (RPA position description). In other words, the RPAs and RPSs need to be able to be in each of their assigned MUs at least quarterly and have the *ability* to provide oversight in these MUs *as required*. And the fact that they must be able to go to *each* of their assigned MUs renders the notion that RPAs or RPSs must be in a specific MU each day nonsensical. There is no ambiguity here—nothing in the Solicitation requires or implies that RPAs or RPSs to be in the same MU every day.

This understanding fits with (and is effectively mandated by) the many provisions in this Solicitation making clear that the Agency's needs will fluctuate dynamically and that the offerors need to account for that in their proposals. As one example, the Solicitation provides that "[t]he medical unit laydown shall be used as the staffing structure for each region, location, and medical unity staffing requirement. However, due to the dynamic nature of CBP operations, CBP *requires* the contractor to maintain an *agile and flexible posture when staffing medical units*." Tab 56.a at AR6143 (emphasis added). And the Solicitation further requires the awardee to "adapt workforce staffing levels and requirements to account for surges in non-citizen migrant traffic." *Id.* at AR6126. Similarly, the position requirements for both the RPAs and RPSs state that they must have the "[a]bility to assist with patient care in time of staff shortage or surge," Tab 52.c at AR5648, AR5654, and the "[a]bility to serve at or provide patient care at alternate medical units within assigned sector/region on an as needed basis as required," *id.* at AR5648, AR5654.

This plain reading of the Solicitation has something more going for it—it is clearly the understanding that Loyal Source had when it prepared its proposal. [ * * * ]. Tab 86 at AR7341. That is clearly permissible under the Solicitation. *See, e.g.*, ECF No. 26 at 22–24.

In the end, there is nothing ambiguous about the Solicitation provisions regarding RPAs and RPSs requiring physical presence on a daily basis in a specific MU.

3.    The term requiring the supervision of sector physicians is not ambiguous.

Loyal Source next argues that there is a patent ambiguity in the requirement that the RPSs must exercise "[c]linical supervisory authority over sector physicians," Tab 52.c at AR5648, because there is no position description for a "sector physician." Thus, Loyal Source contends that offerors could not "account for this scope of work when pricing the RPS labor category." ECF No. 22 at 25. It says the term prejudiced it "because offerors may have priced the firm-fixed-price amounts for the RPS labor category based on differing responsibilities and scopes of work," frustrating intelligent pricing and equal basis evaluation. *Id.* at 26. Loyal Source says the Agency should amend the Solicitation (1) to clarify whether offerors should provide "sector physicians," (2) to clarify whether the scope of work for RPSs includes supervision of "sector physicians," and (3) to revert to rate-based, rather than firm-fixed, pricing. *Id.*

The Government responds that there is no ambiguity because the requirement that RPSs supervise "sector physicians" is in accordance with the broader requirement that RPSs supervise all "front-line personnel" in their regions, which necessarily includes any physicians staffed in their regions. ECF No. 26 at 24–26. The number of physicians staffed in each sector may vary

across offerors' proposals, and the Government contends this variety is part of the Solicitation's intentionally flexible staffing structure.  *See* ECF No. 30 at 4.

To address Loyal Source's challenge to this term, the court begins with the Solicitation's definitions.  The term "region" encompasses the term "sector."  Tab 56.a at AR6124.  A "region" is a "geographical area *equal to* a sector that includes all Border Patrol Stations and Office of Field Operations Ports of Entry."  *Id.* (emphasis added).  Sectors are within regions and are the locations of "headquarters and strategically located stations."  *Id.*  Each RPS oversees some number of physicians in a region, which, by definition, includes physicians in the region's sector.  Thus, it is clear that the term "sector physicians" refers to any physicians who are staffed in the MUs in the sectors within each region that is overseen by its respective RPSs.  It is not ambiguous.

## C.    Customary Commercial Practice and FAR Part 12

Finally, Loyal Source complains that the requirement to provide wage and H&W rates for certain labor categories is impermissible under FAR 12.301 & 12.302 because it is not a standard commercial requirement.  ECF No. 22 at 30–36 (citing Tab 56.b at Instructions).  The contracting officer concluded that the Agency needed the rates, which were only required for those categories subject to the SCLS, "so an assessment using the authority of FAR 52.222-43 can be appropriately made."  Tab 70 at AR6539.  According to the contracting officer, if the Agency "were to only review a loaded labor rate's escalation, without wage rate and H&W information, the Government could not determine whether those rates subject to a wage determination are also being escalated."  *Id.*  He cited two DHS Solicitations and a decision from the CBCA before concluding that "[i]t is common practice to require wage rate and H&W information."  *Id.* at AR6538–39.

Loyal Source primarily argues that the requirement violates FAR Part 12 because it is inconsistent with customary commercial practice.  ECF No. 22 at 30–36.[5]  Ultimately, Loyal Source would like the Agency to destroy the data, amend the Solicitation, and solicit revised offers.  *Id.* at 36–37.

### 1.    The Agency failed to follow the required process in including the disclosure requirement.

Loyal Source argues that the disclosure requirement violates FAR 12.301 and 12.302 "because it is inconsistent with customary commercial practice[]."  *Id.* at 29.  Resolving the argument requires the court to consider the meaning of specific terms that the Agency chose to include in the Solicitation.

In common usage, the term, "provision," usually refers to the clauses in a contract.  Indeed, Black's Law Dictionary defines "provision" to mean "[a] clause in a statute, contract, or other legal instrument."  Black's Law Dictionary (12th ed. 2024).  But the FAR does not.  The

---

[5] It also argues that the requirement was based on inadequate market research, and that the Agency's understanding of adjustments under the SCLS is flawed.  These arguments are addressed below.

FAR defines "clause" and "provision" differently, and the FAR definitions make clear that these terms are *not* interchangeable. This court, of course, must apply the definitions the FAR gives to these terms.

A "clause" or "contract clause" is "a term or condition used in contracts or in both solicitations and contracts, and applying after a contract award or both before and after award." FAR 2.101. So a clause must apply after contract award, and may also apply before. A "solicitation provision," however, is "a term or condition used only in solicitations and applying only before contract award." *Id.* In other words, if a term or condition of a contract applies only before contract award, it is a provision. As an example, a solicitation may include a provision instructing the offeror to provide a "unique entity identifier" on its proposal. *E.g.*, FAR 52.204-6. This requirement is satisfied before contract award (at proposal submission) and because there is no ongoing application, it is a provision. But the solicitation may also include a clause requiring a contractor to ensure that its unique entity identifier remains up to date in the System for Award Management throughout contract performance. *E.g.*, FAR 52.204-12. Because this requirement applies to contractors after contract award, it is a clause. These definitions apply throughout the FAR unless a subpart includes an alternate definition or context "clearly requires a different meaning." FAR 2.101. With these definitions in mind, the court proceeds to the Parties' arguments.

Under FAR 12.301(a), the only subsection of 12.301 for which Loyal Source develops its argument, ECF No. 22 at 29, contracts "shall, to the maximum extent practicable, include only those *clauses* (1) [r]equired to implement provisions of law or executive orders applicable to the acquisition of commercial products or commercial services; or (2) [d]etermined to be consistent with customary commercial practice." FAR 12.301(a) (emphasis added). By its terms, this requirement applies only to clauses, not provisions. This is problematic for Loyal Source's argument because the Solicitation's requirement for offerors to provide wages and H&W rates is not "a term or condition . . . applying after award." Instead, like the example of the unique identifier above, this requirement is satisfied when the offeror submits the data with its proposal. In other words, to the extent it stands alone,[6] the requirement to provide the labor rates is a provision, not a clause.

Loyal Source's efforts to refute this conclusion fail to appreciate the distinction between a provision and a clause. Though it argues that FAR 12.301(a) should apply to solicitation provisions, its sole supporting authority is *Department of the Army-Reconsideration & Request for Modification of Recommendation*, B-411760.3, 2016 WL 3401684 (Comp. Gen. June 15, 2016). *See* ECF No. 28 at 20–21. That decision simply states that in drafting solicitations, an agency should only include clauses that are necessary to comply with law or executive order, or those consistent with customary commercial practice. *See Dep't of the Army-Reconsideration & Request for Modification of Recommendation*, 2016 WL 3401684, at *3–4. But that merely restates the regulation—it does not mean that FAR 12.301(a) applies to provisions. It is obvious

---

[6] There is a FAR *clause* that applies here, FAR 52.222-43, that requires a contractor to provide the wage and H&W information when seeking a price adjustment during contract performance. To the extent the disclosure requirement here is an attempt to tailor this clause or otherwise insert an additional term or condition into the Solicitation, the court addresses these possibilities below.

that solicitations include clauses, but they also include provisions. Here, Loyal Source challenges a *provision*, so 12.301(a) does not apply.

This is confirmed by the fact that the remainder of 12.301 does address provisions and clearly observes the difference between provisions and clauses. Start with 12.301(b), which directs the inclusion of provisions in solicitations and clauses in solicitations and contracts for commercial items or services. Similarly, 12.301(c) allows the inclusion of provisions regarding the evaluation criteria—i.e. things that apply only before contract award. And 12.301(d) similarly requires the inclusion of certain "provisions and clauses." If these terms were interchangeable, such a conjunctive would be nonsensical because the court assumes that each word has a different meaning. *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024) (explaining that "different terms usually have different meanings"). Furthermore, several of the provisions and clauses in this subsection are pairs—i.e. there is a provision that requires certain information in a proposal and a clause that requires the awardee to maintain that information through contract performance. *See, e.g.*, FAR 12.301(d)(1)–(4). Section 12.301(e), which allows discretionary use of provisions and clauses, similarly adheres to the separate meaning of these terms. Finally, 12.301(f) limits the supplementation of provisions and clauses, again maintaining the distinction between a clause and a provision. Thus, there is nothing in the context in which 12.301 uses the terms provision and clause that requires different meanings than the ones in FAR 2.101.

To be sure, Loyal Source does argue broadly that 12.301 applies. And it is abundantly clear that 12.301 limits the provisions an agency may include in solicitations. *See* FAR 12.301(d)–(f). What these subsections mean is that the agency may not carte blanche include provisions; constraints do exist. Loyal Source, however, fails to develop those arguments. Neither will the court.

Loyal Source's arguments under FAR 12.302 fare better. FAR 12.302 recognizes that there exists "a wide range of potential Government acquisitions of commercial products and commercial services." FAR 12.302(a). Because of that wide range, "contracting officers may, [to the maximum extent practicable], and after conducting appropriate market research," tailor the provisions provided in FAR 52.212-1 and FAR 52.212-4 "to adapt to the market conditions for each acquisition." *Id.* But the contracting officer "shall not tailor any clause or otherwise include any additional terms or conditions in a solicitation . . . in a manner that in inconsistent with customary commercial practice for the item being acquired *unless* a waiver is approved in accordance with agency procedures." FAR 12.302(c) (emphasis added).

Here, the crux of Loyal Source's arguments rests on its belief that the disclosure requirement violates customary commercial practice, and therefore 12.302; the crux of the Government's argument is that FAR 12.302 does not apply at all.[7]  In part, at least, the

---

[7] The FAR requires that agencies perform market research regarding "[c]ustomary practices . . . under which commercial sales of the products or services are made." FAR 10.002(b)(1)(iii). The CO concluded that "[i]t is common practice to require wage rate and H&W information in solicitations" based off two prior DHS solicitations and a CBCA decision. Tab 70 at AR6538. Loyal Source also argues that the conclusion is unreasonable because the CO "did not consider, or perform market research regarding, the practices in the commercial healthcare staffing sector."

Government is correct. FAR 12.302(a) focuses only on tailoring the *provision* at 52.212-1 and the *clause* at 52.212-4 (further underscoring the distinction between the two). The former provides instructions to offerors regarding information like late submissions and the content of offers. FAR 52.212-1. The latter lays out contract terms and conditions like "invoices, payments, and disputes." FAR 52.212-4. In other words, "the practical and ongoing ways in which the parties' contractual relationship will operate." ECF No. 26 at 31. Neither of those provisions is at issue here. Nor is FAR 12.302(b), which lists FAR 52.212-4 clauses that may not be tailored.

Where the Government runs into trouble is at FAR 12.302(c), which provides that in order to tailor a clause or "include any additional terms or conditions," the Agency must acquire a waiver "approved in accordance with agency procedures." FAR 12.302(c).[8] To the extent it stands alone, the disclosure requirement is not tailoring a clause because it is a provision, as discussed above. But it is not clear that the requirement stands alone. Rather, it appears to be an additional term or condition that the Agency is trying to impose, which would readily include provisions, or an attempt to tailor FAR 52.222-43 to apply pre-award.

That is a problem because FAR 52.222-43's disclosure requirement does not yet apply to Loyal Source. Under the clause, "rates will be adjusted to reflect the *Contractor's* actual increase or decrease in applicable wages and fringe benefits to the extent that the increase is made to comply with or the decrease is voluntarily made by the Contractor" due to a change in a Department of Labor wage determination, a change otherwise applicable to the contract, or an applicable amendment to the Fair Labor Standards Act. FAR 52.222-43(d) (emphasis added). And under 52.222-43(g), the Government has the right to access all pertinent books and records of the *Contractor*. FAR 52.222-43(g). The rest of the subsection governs wage disputes, so the contracting officer "needed" the data "to assess the veracity of the prospective contractor's 52.222-43 warranty [to avoid unnecessary disputes once] a contract is in place and a request for equitable adjustment is received."[9] Tab 70 at AR6539.

The FAR also makes clear what the obligations of an offeror are at this stage—a warranty "that the prices in this contract do not include any allowance for any contingency to cover

---

ECF No. 22 at 32. Furthermore, it contends the procurements that he referenced in his memorandum are distinguishable, and his market research does not "demonstrate either what customary commercial practices are or that no customary commercial practices exist." *Id.* at 34 (internal quotation marks omitted) (quoting *Orlans PC*, B-420905, 2022 WL 16635146, at *5 (Comp. Gen. Oct. 25, 2022)). The contracting officer clearly recognized that FAR 12.301 and 12.302 require he do *some* research. Looking at prior federal procurements is not enough. The court need not address this argument further because it need not do so to resolve this issue.

[8] FAR 12.302(d) further discusses the procedure agencies must follow to tailor a contract.

[9] The CO cited *Corrections Corp. of America v. Department of Homeland Security*, CBCA 2647, 15-1 BCA P 35971, 2015 WL 2070164 (Apr. 30, 2015). *See* Tabs 70, 70.c. There, a lengthy dispute ensued after the plaintiff sought a FAR 52.222-43 equitable adjustment. Tab 70.c at AR6665.

increased costs for which adjustment is provided under this clause." FAR 52.222-43(b). With that warranty come rather significant disincentives to falsification, including potential liability for fraud, false claims, etc.

The Government is effectively attempting to rewrite the regulation by substituting "offeror" for "contractor." A contractor is "any individual or other legal entity that is awarded a Federal Government contract." 29 C.F.R. § 10.2. Contrast "contractor" with "offeror." An offeror means "offeror or bidder" on a Federal Government procurement. FAR 2.101. Loyal Source, for the purposes of this procurement, is not yet a contractor—it has not been "awarded" this contract. Instead, it is an offeror.

The attempt to add this term or condition triggered the requirement that the Agency obtain a waiver "approved in accordance with agency procedures." FAR 12.302(c). The waiver request must have "describe[d] the customary commercial practice found in the marketplace, support[ed] the need to include a term or condition that is inconsistent with that practice and include[d] a determination that use of the customary commercial practice is inconsistent with the needs of the Government." FAR 12.302(c). That is where the Government fails. It neither requested nor obtained a waiver. The contracting officer's memorandum justifying the inclusion of the additional term or condition does not suffice because it does not comply with 12.302(c)— that is, explaining why an additional term or condition was added does not, of course, mean a waiver was obtained.

So 12.302(c) bars this additional term or condition because the Government failed to follow its mandates.

### 2. Loyal Source cannot show prejudice.

Despite identifying an error, the court will not change the course of this procurement at this stage because Loyal Source cannot show prejudice. *Sys. Stud. & Simulation, Inc.*, 22 F.4th at 997–98. The harm that it alleges is too speculative. Loyal Source says it suffered a "non-trivial competitive injury" because it "divulge[d] confidential and business-sensitive information regarding the compensation it provides to employees." ECF No. 22 at 36. Specifically, Loyal Source complains that "[d]isclosure could . . . occur inadvertently or through a competitor accessing Loyal Source's rates under another contract." ECF No. 28 at 28. That is pure speculation, and pure speculation does not support a protest.

To be clear, this is not data akin to the recipe for Coca Cola or the code to Microsoft Word. Loyal Source did not protest on the ground that this requirement would bar its competition for this award; it merely does not want to turn the data over yet. Indeed, as addressed above, the FAR explicitly gives the Agency the right to access this data and much more in the event of a wage determination during performance, so the issue here is simply the timing of the turning over the data and the fear of disclosure.

Furthermore, it is hard to see how there can be competitive harm from providing the data because the Agency is clear it only needs the information for one purpose: to ensure the "veracity of the prospective contractor's FAR 52.222-43 warranty" during performance. ECF No. 26 at 33 (quotation marks omitted) (quoting Tab 70 at AR6538–39). The Agency will not consider the

data during proposal evaluation, meaning it will not impact the award decision. *Id.* at 36. Nor can Loyal Source contend that it would have submitted different pricing but for the disclosure requirement because the disclosure here simply ensured that offerors did not unlawfully inflate their wage rates. Of course, if the Agency discloses the information, or if it is just a pretext to use the data for evaluation rather than for the proffered reason, such conduct would have all the makings of a *post*-award bid protest.

> 3.    Even if Loyal Source could show prejudice, the court would deny injunctive relief.

To grant injunctive relief, the court considers "whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). Even when a plaintiff succeeds on the merits, the court retains discretion to deny injunctive relief. *PGBA, LLC v. United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) ("We thus hold that, in a bid protest action, section 1491(b)(4) does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award.").

Here, Loyal Source has succeeded on the merits of its FAR Part 12 argument, although it has failed to show prejudice. Assuming Loyal Source could show prejudice, it would satisfy the first prong of success on the merits. This would weigh in favor of injunctive relief.

Loyal Source has not, however, suffered any irreparable harm. It has not lost any ability to compete fairly for this award. It is still in the running for award at this stage. True, it has been forced to provide certain data that it would not otherwise have to provide until contract performance, but for the reasons discussed above, that early disclosure has not prohibited Loyal Source from competing or caused Loyal Source to change its proposal. And the irreparable harm that Loyal Source claims, including the potential disclosure of this data, is speculative.[10] This weighs against injunctive relief.

Loyal Source's delay in bringing this protest also weighs heavily against injunctive relief when balancing the hardships to the parties. The Agency included the current requirement to disclose wage and H&W rates in Amendment 24, which it issued on July 2, 2024. Tab 52.[11] These requirements have not changed since. Yet Loyal Source waited until October 23, 2024, to

---

[10] As discussed in this court's resolution of Loyal Source's other pre-award protest, the fear of disclosure in this case is somewhat more justified given CBP's prior disclosure of information protected by the Procurement Integrity Act. That said, the Agency has moved all aspects of this procurement out of CBP and this court will not presume that those now conducting the procurement (and the contracting officer vetted twice) are similarly willing to disclose proprietary information.

[11] Tab 52.d is an Excel spreadsheet in its native format. The requirements to include the data appears on the instructions tab of this spreadsheet in paragraphs 6–8 under CLIN X001 and paragraphs 8–10 under CLIN X002-X011 – Medical Unit Operations by Region – Time and Material Contract Type.

file its protest at the GAO just hours before proposals were due.[12]  While this is a timely protest under *Blue & Gold*'s waiver regime, that does not mean the court ignores the delay.  *C&E Servs., Inc. v. United States*, 160 Fed. Cl. 182, 191 (2022) (citations omitted).  Indeed, "[t]his court has repeatedly held that a protestor's delay in bringing a protest must be accounted for in the balance of hardships inquiry."  *Team Waste Gulf Coast, LLC v. United States*, 135 Fed. Cl. 683, 693 (2018); *see also Harmonia Holdings Grp., LLC v. United* States, 20 F.4th 759, 767 (Fed. Cir. 2021); *Elmendorf Support Servs. Joint Venture v. United States*, 105 Fed. Cl. 203, 210 (2012) ("Equity aids the vigilant, not those who slumber on their rights.").

Loyal Source seeks an injunction ordering the Agency to destroy entire proposals, amend the Solicitation, accept new proposals, and make new award decisions based on those proposals. That relief is dramatically out-of-balance with the alleged harm.  As discussed above, the data disclosure Loyal Source complains of is information the Government will unquestionably be entitled to during contract performance, so there is little weighing in favor of Loyal Source.  But the harm to the Government would be dramatic—it would have to start anew with this procurement simply to remove a disclosure requirement for data that is not being considered at this stage.  Other offerors, none of whom complained about disclosing any of the data the Agency required them to produce, would also incur costs revising their proposals.  The only beneficiary of Loyal Source's proposed relief is Loyal Source, which has been performing under sole-source bridge contracts since 2022 and would continue to do so for the added time that the new procurement would take.  In the end, the balance of the harms weighs heavily—almost dispositively—against injunctive relief.  Of course, if Loyal Source had come to the court in July or August when the relief would simply require the removal of a few instructions on a spreadsheet, the balance of the harms would have been dramatically different.

The public interest also weighs against injunctive relief.  The services at issue in this case—medical care for migrants along the Southern Border—are certainly essential services. The Agency has updated the terms of the Solicitation to account for changes in migration since the award of the predecessor contract and should be able to implement those updates through a contract award rather than continuing the incumbent contract through a series of bridge contracts. Thus, the public interest weighs against injunctive relief.

### D.    Motion to Supplement

Loyal Source also moved to supplement the record with a declaration signed by Brian Moore, Loyal Source's CEO.  ECF No. 22-1 at 1, ¶ 2.; ECF No. 23.  The declaration relates to the Solicitation requirement that offerors include their wage and H&W rates underlying their fully burdened rates.  ECF No. 23 at 2.  Recall that the contracting officer concluded the Agency needed the information to assess the "veracity of the prospective contractor's FAR 52.222-43 warranty," and that requiring the information aligned with customary commercial practice.  Tab 70 at AR6538–39.

---

[12] Because Loyal Source had Case No. 24-1001 pending in this court, the GAO dismissed the October 23 protest and Loyal Source filed this protest on November 22, 2024.  ECF No. 1.

"The focus of judicial review of agency action [is] the administrative record . . . ." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). "Discovery is typically not available in bid protest cases . . . ." *Rotair Aerospace Corp. v. United States*, 167 Fed. Cl. 571, 577 (2023). However, the record may be supplemented if the "existing record is insufficient to permit meaningful review consistent with the APA." *Axiom Res. Mgmt.*, 564 F.3d at 1381. "A court may order depositions . . . when 'the record [i]s inadequate to' explain a contracting officer's procurement decision," when "'required for meaningful judicial review,'" or when "serious questions as to the rationality of the procurement decision have been raised." *Off. Depot, Inc. v. United States*, 94 Fed. Cl. 294, 296, 298 (2010) (quoting and citing *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1337–40); *Sonoran Tech. & Pro. Servs., LLC v. United States*, 132 Fed. Cl. 475, 478 (2017). A court may "order the agency to include documents that were not considered in making its decision, but should have been." *Advanced Tech. Sys. Co. v. United States*, No. 23-1000, 2023 WL 8805707, at *3 (Fed. Cl. Oct. 4, 2023). According to Loyal Source, the requirement is inconsistent with customary commercial practices. It argues the declaration is necessary for effective judicial review because it "establishes the customary commercial practices in the healthcare staffing services industry based on Mr. Moore's professional experience in the industry" and informs the "Agency's purported 'market research.'" ECF No. 23 at 2. But as the discussion above shows, the court does not need the declaration to resolve this matter. Therefore, the court denies Loyal Source's motion to supplement.

## IV.    Conclusion

For the foregoing reasons, the court **DENIES** Loyal Source's motion for judgment on the administrative record, ECF No. 21; **DENIES** Loyal Source's motion to supplement the administrative record, ECF No. 23; **GRANTS** the Government's cross-motion for judgment on the administrative record, ECF No. 26; and **DIRECTS** the Clerk's Office to enter judgment accordingly.

It is so ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge
